# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE VIRGIN ISLANDS

UNITED STATES OF AMERICA
*Plaintiff*

v.

CASE NO.:  23-010 (WAL)

KEYRAN COTO LOPEZ
*Defendant*

TO THE HONORABLE COURT
HONORABLE WILMA A. LEWIS
DISTRICT COURT JUDGE
FOR THE DISTRICT OF THE VIRGIN ISLANDS

## SENTENCING MEMORANDUM

Keyran Coto Lopez is a humble fisherman from Costa Rica.  He maintains his wife, three kids, and his sick father.  Keyran makes roughly $40 per day as a fisherman.  However, there are days that the fish aren't biting. Nevertheless, his kid's stomachs need feeding regardless. His father still requires his medication.  In sum, life continues whether Keyran has a dollar in his pocket or not.

  

1

Nobody knows this better than the people who recruit impoverished men like Keyran to risk their lives and freedom in exchange for years-worth of income.

I believe that we sometimes do not realize the level of poverty of the men that come before this court time and time again. They are desperate to maintain their families within societies where their economic potential is limited by their countries socio-economic realities.

 

Young men like Keyran are easy targets. They are at the lowest level of large-scale drug organizations. They are basically expendable. They have no say in the quantity of the contraband that is to be transported. They have no input on how it will be transported, where or to whom it will be delivered. Most importantly, they have no ownership interest in the contraband. These men are motivated, for the most part, by one universal desire, that is, the well-being of their families.

  

2

Keyran Coto Lopez' family is struggling in his absence. His unemployed wife has the burden of caring for her children and sick father-in-law. Her youngest child has recently been hospitalized with a respiratory tract infection. They are desperate and with few options of any meaningful support and assistance. Even if his wife could find a job, she has no childcare to allow her to be away from home while she is working.

Because Keyran is a foreign national and was brought to the United States for this prosecution, his conditions differ from those of U.S. citizen prisoners who are usually placed in federal prisons and can spend up to a year in home confinement or a residential reentry center. In contrast, Keyran will be held at a higher security level than similarly situated American prisoners and will have to serve the entirety of his term, including the portion eligible American prisoners would serve in a reentry center or on home detention. Furthermore, if a deportation order is entered while he is incarcerated, he will not be eligible for any good-time credit. In other words, prison time is harsher for immigrant defendants than American citizens.

We remind this Honorable Court that the base offense levels of Section 2D1.1 have no empirical grounding. Where a guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85 (2007).

As we have argued before to this Honorable Court, Section 2D1.1 focuses on the quantity of controlled substances as the primary sentencing factor for most narcotics offenders. The focus on quantity is a problem because quantity is a poor proxy for the seriousness of the crime committed and differentiating between defendants who have committed crimes of different seriousness. Using quantity as the primary sentencing factor is misguided because this focus fails to differentiate between defendants based on culpability. This method of mapping randomly increasing drug quantity to

3

incremental increases in offense levels may capture broad notions of harms or blameworthiness, but it does not address the harm in specific cases. Causation, harm, and *mens rea* exist between the gaps in the drug weight table's drug amounts and it is within those gaps, filled by § 18 U.S.C. 3355, that this Honorable Court finds the appropriate sentence for Keyran Coto Lopez.

The Safety Valve's relief from the drug-quantity-based sentencing is appropriate where young men like Keyran are used to transport South American drugs at the behest of the multinational drug traffickers.

This type of case illustrates the gulf between low-skilled couriers and the masterminds who are really running these operations. Keyran did not own the contraband at issue. Nor did he grow it, launder proceeds related to it, protect it in stash houses, or run paramilitaries and corrupt politicians in order to protect it. He is precisely the type of low-information, first-time courier deserving relief from the clumsy quantity-based drug sentencing regime. *Cf.* Patti B. Saris, *A Generational Shift for Federal Drug Sentences,* 52 Am. Crim. L. Rev. 71, 6 (2015) (referencing couriers and mules - without qualification - as examples of defendants who qualify for mitigating-role adjustments). Indeed, the Commission's reason for Amendment 794 was based on a conclusion that "mitigating role is applied inconsistently and more sparingly than the Commission intended." *See* U.S. Sentencing Guidelines Manual, supp. to app. C, amend 794, at 115. The Commission's focus for consistency was "couriers and mules," defendants situated similarly to Keyran.

Furthermore, because of several Commission studies regarding the nature of the criminal history of federal offenders, including analyses of the number and types of prior convictions included as criminal history and the ability of the criminal history rules to predict an offender's likelihood of rearrest, the Commission promulgated an amendment benefitting zero-point offenders. We anticipate that this amendment will be in effect at the time of Keyran's sentence. Offenders who do not receive any criminal history points from Chapter Four, Part A. Subpart 1 provides for an adjustment for

4

certain offenders with zero criminal history points. The new §4C1.1 provides a decrease of two levels from the offense level determined under Chapters Two and Three for offenders who did not receive any criminal history points under Chapter Four, Part A and who meets all of the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A;  (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);  (3) the defendant did not use violence or credible threats of violence in connection with the offense;  (4) the offense did not result in death or serious bodily injury;  (5) the instant offense of conviction is not a sex offense;  (6) the defendant did not personally cause substantial financial hardship;  (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;  (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);  (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

Keyran Coto Lopez meets all the above listed criteria and therefore should be granted a 2-point reduction bringing his new Total Offense Level to 21, with a Criminal History Category of I, his new Guideline Range is 37 – 46 months.

Reasonable people may disagree on what is just punishment. However, no reasonable person can turn a blind eye to the overwhelming empirical data regarding the failure of mass incarceration as either a deterrent factor or as a means of protecting the public. According to the United States Department of Justice, sending an offender to prison isn't an effective way to deter crime. Prisons are

good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crimes and prisons may have the opposite effect.[1]

This Honorable Court's power extends far beyond Keyran's fate. Families are significantly impacted by incarceration. Among the findings of an extensive study are: 1) people with convictions are saddled with copious fees, fines, and debt at the same time that their economic opportunities are diminished, resulting in a lack of economic stability and mobility; 2) many families lose income when family member is removed from household wage earning and struggle to meet basic needs while paying fees, supporting their loved one financially, and bearing the costs of keeping in touch; 3) women bear the brunt of the costs "both financial and emotional" of their loved one's incarceration; 4) families incur large sums of debt due to their experience with incarceration; 5) despite their often-limited resources, families are the primary resource for housing, employment, and health needs of their formerly incarcerated loved ones, filling the gaps left by diminishing budgets for reentry services; 6) incarceration damages familial relationships and stability by separating people from their support systems, disrupting continuity of families, and causing lifelong health impacts that impede families from thriving; 7) the stigma, isolation, and trauma associated with incarceration have direct impacts across families and communities.[2]  Therefore, incarcerating Keyran would only serve to create a negative impact on his family, which in turn will affect his rehabilitative process. To the extent that his family is well, he as the father and son is also well.

Oxford Dictionary defines *opportunity* as set of circumstances that makes it possible to do something. It does not take an expert in social sciences to figure out why Kayran Coto Lopez is standing before this Honorable Court. From day one, the circumstances in his life not only made it

---

[1] http://www.nij.gov/five-things/pages/deterrence.aspx.
[2] Saneta deVuono-powell et al., *Who Pays, The True Cost of Incarceration on Families*. Oakland, CA: Ella Baker Center, Forward Together, Research Action Design (2015)

6

possible for him to be here, but also probable. The set of circumstances in Keyran's life that made it possible for him to do something(his opportunity) was to be here before your Honor.

Nothing of the aforementioned should be construed as an excuse of free will or personal responsibility. Our goal is simply to put Keyran's behavior in a context that gives this Honorable Court reassurance that there are effective strategies that can be implemented to promote the factors contained in 18 U.S.C. 3553(a) beyond an extended period incarceration. Although we are firm believers in personal responsibility, we also realize that we cannot expect people to be successful without giving them the proper tools to achieve success.

**RESPECTFULLY SUBMITTED**,

In San Juan, Puerto Rico, October 20, 2023.

S/*Giovanni J. Canino*
Giovanni J. Canino
USDC-PR Bar No. 225503
PO Box 6688
San Juan, PR 00914
gcanino@gmail.com

7