IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>) Criminal No. 2023-CR-0010<br>v. )<br>)<br>LUIS ANTONIO ORELLANA- )<br>ORELLANA, )<br>)<br>Defendant. )<br>) | |

DEFENDANT'S SENTENCING MEMORANDUM

LUIS ANTONIO ORELLANA-ORELLANA, a fifty-nine (59) year old national of Costa Rica, stands before the Court with no criminal history points after having pled guilty to conspiring to possess and distribute marijuana while on board a vessel. The net weight of the marijuana was one thousand four hundred (1,400) kilograms. He has been detained and incarcerated since November 7, 2022. He is minor role and safety valve eligible. After he completes his sentence, he will be deported to Costa Rica. Mr. Orellana timely accepted responsibility for his conduct and stands ready for sentencing on November 29, 2023. He promptly accepted a plea agreement with a recommended guideline range of 46-57 months. The final presentence investigation report ("PIR") was electronically filed on July 31, 2023, and recommended a guideline range of 46-57 months. He is eligible for an additional two-level reduction for zero-point offenders effective November 1, 2023. As discussed herein, based on Mr. Orellana' history and characteristics, additional policy considerations, and an adjusted offense level of 21, a sentence of 37 months is sufficient to carry out the purposes set forth in 18 U.S.C. §3553(a).

1

Mr. Orellana's History and Characteristics.

Mr. Orellana was born on ▇▇▇▇▇▇▇, in Puntarenas, Costa Rica from a consensual relationship between Luis López and Estervina Orellana, both deceased. The father abandoned the family when Mr. Orellana was four years old while he was hospitalized with polio. He kept a distant relationship with his father until his death. His mother took care of the family as a sole provider. He and his nine siblings were initially raised on a banana farm located in Palmar Sur, Costa Rica. When the banana company permanently closed, his mother relocated along with her children to Puntarenas where his siblings still live. His mother worked as a maid for a nearby wealthy family. Although his family lived in difficult conditions, they never lacked food or shelter since his mother worked so hard. He experienced a normal childhood despite having poliomyelitis. He lived at his mother's home until age 24 when he began a consensual relationship with his girlfriend, Mari Luz, who is the mother of his oldest son Jorge Orellana. His mother died on June 10, 1988, at age 54. Her death was very difficult for him and he suffered from depression for several years. He received moral and emotional support from his partner and siblings which got him through this trying time.

Mr. Orellana attended school until the tenth grade. He has no further academic or vocational training. He worked various jobs in construction. From 1984 to 1990, he worked at Sardimar Tuna Fish Processing Company in the packing department. From 1992 to 1993, he worked at Puntarenas Yacht Club repairing boats. He always remained self-employed as a fisherman. Mr. Orellana describes himself as extrovert and someone who likes to help others. At age 26, he relocated to Provincia Limón where he worked cutting palmetto. He voluntarily joined a community program sponsored by "IAFA" to help in the prevention and treatment of drug addicts where he was a speaker and master of ceremony. He served as an IAFA volunteer and denies ever

having a drug or alcohol addiction. Mr. Orellana claims to feel well physically and emotionally now. His only health problem are cataracts and is authorized to undergo eye surgery while at MDC Guaynabo.

Mr. Orellana became involved in this case after his young brother José, a fisherman, refused the offer to participate in this drug smuggling venture. José was pressed by the individuals running the venture to participate. Mr. Orellana took the job to protect him. Mr. Orellana talked to the individuals involved and informed them that his brother José had a family to take care of and didn't want any trouble. Mr. Orellana felt more qualified to do the job as he was an experienced fisherman and sailor. He was to receive a few hundred dollars. Mr. Orellana had no criminal history before this case and is remorseful for his involvement. He does not intend on ever being involved in any future criminal activity.

The Nature and Circumstances of This Offense

The parties stipulated to the facts and offense conduct in the plea agreement and as accurately memorialized in the PIR at Paragraphs 16-18. On November 7, 2022, law enforcement was patrolling south of Boca Chica, Panama and observed a go-fast vessel named AGAMENON traveling with three occupants onboard. The master claimed Columbian nationality for the vessel. Mr. Orellana was a crewmember of the vessel which had 1,400 kilos of marijuana on board. Mr. Orellana admitted his role in the drug trafficking venture and that his job was to fuel the boat. He was not the captain of the boat, nor did he help load the drugs. He had no knowledge of the ultimate quantity of drugs involved nor was he involved in the planning and ultimate destination of the drugs.

## Men Like Mr. Orellana Deserve Additional Consideration When Used As Nautical Drug Mules In High Sea Drug Conspiracy Cases.

Men like Mr. Orellana are often "given opportunities" by the drug cartels as nautical drug mules because of their impoverished status and knowledge of the sea. They will work under any conditions. Seldom if ever do they know the gross or net weight of the drugs they transport nor do they possess detailed knowledge of a drug cartel's activities. USSG § 2D1.1(c) sets forth "a drug quantity table based on drug type and weight to set base offense levels for drug trafficking offenses." *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). The greater the quantity of drugs, the higher the base-offense level, and thus sentencing range. This quantity-based approach originated in the Anti-Drug Abuse Act of 1986 ("1986 Act"), which "created a two- tiered scheme of five- and ten-year mandatory minimum sentences for drug manufacturing and distribution offenses." *Id.* at 95. In the 1986 Act, "Congress sought to link the ten-year mandatory minimum trafficking prison term to <u>major drug dealers</u> and to link the five-year minimum term to <u>serious traffickers</u>." *Id.* (internal quotation marks omitted)(emphasis added). The 1986 Act used the weight (and thus quantity) of the drugs involved in the offenses "as the sole proxy to identify 'major' and 'serious' dealers." *Id.* Even though the statute specified only the two quantities of each drug that would trigger the mandatory sentences, the Commission decided to extend the quantity-based approach across the full range of possible drug quantities. *See Kimbrough*, 552 U.S. at 97 as cited in *United States v. Johnson*, 379 F.Supp.3d 1213, 1219 (M.D. Alabama 2019). At the time the Commission adopted the Guidelines, it failed to explain why it implemented the quantity-based approach for all trafficking offenses, and to thereby "greatly elevate" the "importance of quantity" as "compared to other offense characteristics." United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 49-50 (2004),

https://www.usse.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year study/15_year_study_full.pdf (hereafter *Fifteen Years of Guidelines Sentencing*); *see also* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998) (asserting that the Commission had "nowhere stated, much less explained, why these quantifiable differences in harm caused are *appropriate* measurements of the extent of individual culpability"). More than 20 years after the Guidelines were originally promulgated, Judge Gertner wrote that the Commission still had not "explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing." *United States v. Cabrera*, 567 F.Supp.2d 271, 276 (D. Mass 2008). "The only explanation, which one has to infer from the Guidelines, is that drug quantity is somehow a proxy for culpability." *Id.*

Soon after the drug-trafficking guidelines' enactment, "[s]ome observers doubted that drug quantity was a reliable measure of offense seriousness," *Fifteen Years of Guidelines Sentencing* at 50, especially "for the culpability of low-level offenders, who may have contact with significant amounts of drugs, but who do not share in the profits or decision-making," *id.* (citing Catherine M. Goodwin, *Sentencing Narcotics Cases Where Drug Amount is a Poor Indicator of Relative Culpability*, 4 Fed. Sentencing Rep. 226 (1992); Steven B. Wasserman, *Toward Sentencing Reform for Drug Couriers*, 61 Brook. L. Rev. 643 (1995)). Given "the problems with relying on drug type and quantity to measure the seriousness" of drug crimes, critics "called for a fundamental re-examination of the role of quantity under the guidelines." *Id.* at 52 (citing Frank O. Bowman III, *The Quality of Mercy Must Be Restrained, and Other Lessons in Learning to Love the Federal Sentencing Guidelines*, 1996 Wis. L. Rev. 679 (1996); Jonathan P. Caulkins et al., *Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money?* (RAND 1997)).

5

More recently, over the past decade, courts have increasingly recognized that "drug quantity is a poor proxy for culpability." *United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013), at *13; *see also Cabrera*, 567 F.Supp.2d at 276-77; *United States v. Hayes*, 948 F.Supp.2d 1009, 1027-28 (N.D. Iowa 2013); *United States v. Woody*, 2010 WL 2884918, at *9 (D. Neb. July 20, 2010) (Bataillon, C.J.) (stating that in drug conspiracy cases, quantity "is not always a trustworthy measure of the culpability of an individual defendant").

Judge Gleeson persuasively explained this point in *Diaz*: "Drug quantity is not irrelevant in assessing a drug trafficking defendant's culpability, and there is nothing inherently wrong with the Guidelines taking drug quantity into account. If all else is equal, a dealer who sells 50 kilograms of heroin inflicts more harm on society, and deserves greater punishment, than one who sells one kilogram." 2013 WL 322243, at *12. However, "two drug trafficking cases are rarely alike in all respects except quantity." *Id.* Many "factors distinguish one drug offender's culpability from another," including his compensation, whether he had a proprietary interest in the drugs, the length of his involvement in the trafficking, and his reasons for getting involved and for stopping. *Id.* Perhaps above all else, the most important factor distinguishing the culpability of defendants is their role in the crime. Unfortunately, however, "[d]rug quantity, which should count as one among many sentencing factors, and not the most important one at that, [is] the *only* sentencing factor. In no other crime is the Guideline range so heavily determined by a single offense characteristic." Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem Is Uniformity, Not Disparity,* 29 AM.CRIM. L.REV. 833, 854 (1992).

The Judicial Conference of the United States has questioned the wisdom of relying so heavily on drug weight: "[T]he Judicial Conference ... encourages the Commission to study the wisdom of drug sentencing guidelines, which are driven virtually exclusively by the quantity or

weight of the drugs involved." JUDICIAL CONFERENCE OF THE UNITED STATES, 1995 ANNUAL REPORT OF THE JCUS TO THE U.S. SENTENCING COMMISSION 2 (1995). The offender's role in the crime is more useful for determining culpability than the quantity of drugs involved. *See Diaz, supra,* at *13. As Judge Gleeson explained, the "managers and leaders of a drug organization actively plan the organization's activities, plot to increase its profits, and recruit its members." *Id.* Consequently, they are more likely to initiate drug-related crimes and increase their scale. *See id.* A low-level dealer or courier, by contrast, "is easily replaceable and does little to advance the overall drug organization." *Id.; see also* United States Sentencing Commission, *2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, at 166 (2011) (hereafter "*Mandatory Minimum Report*") ("offenders at higher levels of the drug distribution chain are presumed to be more culpable based on their greater responsibilities and higher levels of authority"). It should be the Pablo Escobars, Tony Montanas, and Walter Whites of the world who bear the greatest culpability, not the street peddlers, middlemen, and mules, regardless of the quantity of drugs that happens to be involved in the crimes for which they are convicted. See *United States v. Johnson*, 379 F.Supp.3d 1213, 1219 (M.D. Alabama 2019). As the Commission admits, "the quantity of drugs involved in an offense is not as closely related to the offender's function in the offense as perhaps Congress expected" when it passed the 1986 Act, on which the drug trafficking Guidelines are based. *Mandatory Minimum Report*, at 350. The Commission's own study found that for every function--ranging from suppliers and importers to lower-level functions such as couriers and mules—the "quantity of drugs involved in the offense on average resulted in a median base-offense level that included or exceeded the five-year mandatory minimum penalty" that Congress originally intended for "serious" dealers. *Id.* at 350-51; *see also* United States Department of Justice, *An Analysis of Non-Violent Drug Offenders with Minimal*

7

*Criminal Histories*, at 12 (1994) ("Regardless of the functional role a defendant played in the drug scheme, the drug amounts involved in the offense are similar across the roles."). *Cabrera* is a prime example of drug quantity *not* functioning as an accurate proxy for the defendant's role in the offense, and more generally, his culpability. *See id.* at 277 ("In this case, drug quantity most assuredly is not an accurate proxy" for culpability).

Much like *Cabrera*, Mr. Orellana was part of a small crew who had no knowledge of the actual weight of the marijuana on board the vessel. He was not the captain. He did not help load the drugs. His job was to fuel the boat. *Cabrera* also serves to rebut a second hypothetical defense of the quantity-based drug sentencing regime: namely, the notion that the Guidelines adequately consider the offender's role through mitigating role adjustments. USSG §§ 3B1.1 and 3B1.2 allow for the offender's offense level to be increased or decreased by between two and four levels if he had an aggravating or mitigating role in the crime. Importantly, Judge Gertner assigned Cabrera a four-level "minimal role" downward dissimilarity pursuant to USSG § 3B1.2(a). *See id.* at 278. The application of the mitigating role dissimilarity triggered the mitigating role cap for drug crimes pursuant to USSG § 2D1.1(a)(5), which further lowered the offense level by two levels. Accordingly, Cabrera's offense level of 32 decreased by a total of six levels based on his mitigating role. Subtracting an additional three levels for acceptance of responsibility, and two for meeting the criteria of the safety valve, his total- offense level was 21. *See id.* Combined with a criminal-history category I, the Guidelines range was 37-46 months of prison. *See id.* Nonetheless, Judge Gertner still concluded that the 18 U.S.C. § 3553(a) factors required a downward dissimilarity to a sentence of 24 months. *See id.* at 278-79. In other words, even with the adjustments for Cabrera's mitigating role, the sentence needed to be further reduced by about a *third* of the low end of the Guidelines range. The sentence calculation in Cabrera's particular case

8

thus illustrated Judge Gertner's broader observation that the deductions for a defendant's minor role available in the Guidelines "are limited and do not come close to offsetting the high quantity-driven base offense level." *Id.* at 272-73. Similarly, in *Diaz*, Judge Gleeson also observed that the "Guidelines take role into account, but not nearly enough." 2013 WL 322243, at *13. He reasoned that the mitigating and aggravating role adjustments under USSG §§ 3B1.1 and 3B1.2 allow for only up to eight levels of differentiation. *See id.* at *13. This pales in comparison to the up to 32 levels among defendants based on drug quantity enshrined by USSG § 2D1.1(c), even when you add the additional reduction in levels permitted under the mitigating role cap in USSG § 2D1.1(a)(5). *Id.*

The bottom line is that drug quantity does not always correspond with a defendant's role or culpability, and this problem is not sufficiently offset by the Guidelines' downward adjustments for mitigating roles. The drug-trafficking guidelines suffer from an "over-emphasis on quantity" and "under-emphasis on role in the offense." *Cabrera*, 567 F.Supp.2d at 275; *see also Hayes*, 948 F.Supp.2d at 1027; *Diaz*, 2013 WL 322243, at *2 (recommending that the drug trafficking Guidelines be "more sensitive to factors directly relevant to culpability, including the defendant's role in the offense, and less sensitive to drug type and quantity"). *United States v. Johnson*, 379 F. Supp. 3d 1213, 1219–23 (M.D. Ala. 2019). The flaws in the Guidelines, as discussed by *Diaz, Cabrera*, and the other cases cited above, apply equally to Mr. Orellana's case.

Admittedly, Mr. Orellana pled guilty to an offense which ultimately involved 1,400 kilograms of marijuana. He played a minor role in the overall drug activity and did not decide how much marijuana would be involved, and thus had no role in determining the potential harm caused by the amount of marijuana involved in the offense. Nor did he have a proprietary interest in the drugs themselves—he would not share in the profits derived therefrom. Unlike *Diaz* and *Cabrera*, however, the Guidelines do not allow his diminished role to be accounted for—as compared to the

real leaders, organizers and profiteers of this offense. But compared to the true leaders and organizers, his played a minor role—an offense in which he lacked a proprietary interest or decision-making capabilities over the amount of marijuana. This Court has yet to see any cases where major drug cartel members or recruiters are prosecuted as intended by the Guidelines. Mr. Orellana has a PSR guideline range of 37 to 46 months. His history and characteristics of an otherwise law-abiding life support a sentence of thirty-seven (37) months. His family has been harshly punished for his extended incarceration. Once released and deported, he is otherwise capable of earning a lawful living and is not likely to reoffend given his employment history. Accordingly, this court should impose the minimum sentence of thirty-seven (37) months which will result in a sentence that is sufficient but not greater than necessary to meet to carry out the purposes set forth in 18 U.S.C. §3553(a).

Dated: October 30, 2023                                     Respectfully submitted,

                                                               s/ Gabriel J. Villegas
                                                            GABRIEL J. VILLEGAS, ESQUIRE
                                                            Senior Assistant Federal Defender
                                                            4094 Estate Diamond Ruby, Ste 5
                                                            Christiansted, VI  00820
                                                            Tel: (340) 773-3585
                                                            E-Mail:Gabriel_Villegas@fd.org